01 cv 808 rul

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DREAMCATCHER SOFTWARE          :
DEVELOPMENT, LLC               :
  Plaintiff,                   :
                               :
v.                             :    3:01CV808(AVC)
                               :
POP WARNER LITTLE              :
SCHOLARS, INC.                 :
  Defendant                    :

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is an action for damages.  It is brought pursuant to

the Connecticut Uniform Trade Secrets Act ("CUTSA"), Conn. Gen.

Stat. § 35-51, the Connecticut Unfair Trade Practices Act

("CUTPA"), Conn. Gen. Stat. § 42-110a, the Lanham Act, 15 U.S.C.

§ 1125(a)(1), and common law tenets concerning breach of

contract, product disparagement, and tortious interference with

business expectancies.  The defendant, Pop Warner Little Scholars

("Pop Warner"), has filed the within motion for summary judgment

pursuant to Fed. R. Civ. P. 56(b), arguing that there are no

material questions of fact in dispute and that it is entitled to

judgment as a matter of law.

The issues presented are: (1) whether there is a question of

fact regarding the existence of a trade secret; (2) whether the

Lanham Act cause of action must fail because the defendant is not

in the business of selling software; (3) whether a question of

fact exists regarding the falsity of the statements that serve as

the basis of the Lanham Act and common law product disparagement

causes of action; (4) whether a question of fact exists regarding the existence of business expectancies sufficient to sustain the cause of action for tortious interference with a business expectancy; (5) whether the CUTPA cause of action must fail because the defendants had no duty to affirmatively act on behalf of the plaintiffs; and (6) whether there is a question of fact regarding the defendant's alleged breach of the software license.

The court concludes that: (1) there is a question of fact regarding the existence of a trade secret; (2) the fact that the defendant is not in the business of selling software does not defeat the plaintiff's Lanham Act cause of action; (3) material questions of fact exist regarding the truth of the statements that serve as the basis for the Lanham Act and common law product disparagement causes of action; (4) there is no material question of fact regarding the existence of a business expectancy; (5) the fact that defendant's had no affirmative duty to act on the plaintiff's behalf does not necessitate summary judgment of the CUTPA cause of action; and (6) the plaintiffs have failed to adduce sufficient evidence to establish that there is a material question of fact regarding a breach of the software license.

For the reasons stated herein, the defendant's motion for summary judgment (document no. 48) is GRANTED in part and DENIED in part.

2

## FACTS

Examination of the complaint, affidavits, pleadings, exhibits, supplemental materials, and Rule 9(c) statements discloses the following undisputed, material facts:

The defendant, Pop Warner Little Scholars, Inc. ("Pop Warner") is a not-for-profit national organization that organizes and conducts regional and local Pop Warner youth football and cheerleading leagues throughout the United States. Pop Warner owns the trademarks POP WARNER and POP WARNER LITTLE SCHOLARS.

The plaintiff, Dreamcatcher Software Development, LLC ("Dreamcatcher") is a Connecticut organization that develops software. William Brown, a member of Dreamcatcher, developed a software program called Keystroke Administrator. Keystroke Administrator automated or computerized the management of paperwork and other administrative functions associated with the operation of a local Pop Warner league.

During the summer and fall of 1999, Brown attempted to enlist Pop Warner to aid in the sales and marketing of its software program. On January 24, 2000, and to that end, Jon Butler, the Executive Director of Pop Warner, and Brown executed a non-disclosure and confidentiality agreement. That confidentiality agreement stated that Pop Warner was "interested in examining a product idea of [Dreamcatcher] and may wish to become a strategic development partner of [Dreamcatcher] or a

3

Customer/ Beta Site for the product and in connection therewith will be given access to certain confidential and proprietary information." On February 8, 2000, Brown met with various employees of Pop Warner. At this meeting, Brown both demonstrated and explained the capacities of his software.

Subsequent to the February 8, 2000 meeting, Dreamcatcher began calling the software program "Pop Warner Administrator." Dreamcatcher continued to refer to the program as Pop Warner Administrator until October 2000. In the spring of 2000, Brown provided Pop Warner with two laptop computers which were loaded with the Pop Warner Administrator program. Accompanying those computers was a software license that prohibited the end user from, among other things, decompiling, reverse engineering, disassembling or otherwise reducing the Pop Warner Administrator software to a human readable form.

In 1998, Pop Warner, prior to its discussions with Dreamcatcher, had engaged the services of Frontline Interactive, LLC ("Frontline"), to develop a website for Pop Warner. Frontline subsequently contracted with Interactive Planet, Inc. ("Interactive") for the development of the software and website. In early 2000, Interactive began to develop administrative software to allow Pop Warner leagues to compile and file the requisite forms with Pop Warner national.

On October 17, 2000, Pop Warner Executive Director Butler sent a letter to Dreamcatcher informing it that Pop Warner's

4

marks could not be used in conjunction with Dreamcatcher's
products.  On November 14, 2000 and December 1, 2000, similar
letters were sent to Dreamcatcher.  Dreamcatcher thereafter
changed the software program name to Administrator.  On May 8,
2001, Dreamcatcher filed the instant lawsuit.  At the February 8,
2000 meeting, according to the complaint, Pop Warner stated that
it was interested in the software, that the software filled in
existing need in the industry and that they would support
Dreamcatcher in marketing the software to various Pop Warner
leagues throughout the country.  The complaint further alleges
that from the period of February 8, 2000, Pop Warner did indeed
aid Dreamcatcher in the marketing and sales of its product to
various Pop Warner leagues throughout the country.

The complaint also alleges that, at the same time, and
unbeknownst to Dreamcatcher, Pop Warner, through a partnership
with Interactive and/or various other consultants, was developing
competing software and that it had used Dreamcatcher's software
as a model in the design of its program.  Additionally, the
complaint alleges that Pop Warner was disparaging Dreamcatcher's
product by making false statements regarding its software in the
marketplace.

**STANDARD**

On a motion for summary judgment, the moving party must show
that there are no genuine issues of material fact in dispute and

5

that it is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106

S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute regarding a

material fact is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."

Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d

Cir.1992) (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505).

The court resolves "all ambiguities and draw[s] all inferences in

favor of the nonmoving party in order to determine how a

reasonable jury would decide."  Aldrich, 963 F.2d at 523.  Thus,

"[o]nly when reasonable minds could not differ as to the import

of the evidence is summary judgment proper." Bryant v. Maffucci,

923 F.2d 979, 982 (2d Cir.1991).

     In opposing a motion for summary judgment, the "adverse

party may not rest upon the mere allegations or denials of [its]

pleading," but must "set forth specific facts showing that there

is a genuine issue for trial."  Fed R. Civ. P. 56; see D'Amico v.

City of New York, 132 F.3d 145, 149 (2d Cir.1998).  "If the

adverse party does not so respond, summary judgment, if

appropriate, shall be entered against the adverse party."

Fed.R.Civ.P. 56(d).  "[T]he mere verification by affidavit of

one's own conclusory allegations is not sufficient to oppose a

motion for summary judgment."  Zigmund v. Foster, 106 F.Supp.2d

352, 356 (D.Conn.2000) (citations and quotation marks omitted).

Furthermore, "[t]he mere existence of a scintilla of evidence in

6

support of the [non-moving party's] position will be insufficient
[to avoid the entry of judgment against the non-moving party];
there must be evidence on which the jury could reasonably find
for the [non- moving party]."  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**DISCUSSION**

1.    Uniform Trade Secrets Act

Pop Warner first contends that summary judgment should be
granted with regard to the CUTSA cause of action because
Dreamcatcher "wholly fails to identify its trade secret," a
necessary element to any CUTSA cause of action.  Specifically,
Pop Warner contends that Dreamcatcher only identifies its trade
secret "as the manner in which persons affiliated with Pop Warner
gather information, . . . and that [Dreamcatcher] has no
exclusivity to that knowledge."

Dreamcatcher responds by stating that there are material
questions of fact as to whether trade secrets were revealed to
Pop Warner.

It is undisputed that a plaintiff must establish the
existence of a trade secret before he can seek protection under
CUTSA.  See Elm City Cheese Co., Inc., v. Federico, 251 Conn. 59,
70 (1999); Plastic & Metal Fabricators, Inc. V. Roy, 163 Conn.
257, 267 (1972).  Connecticut General Statutes § 35-51(d) defines
a trade secret as: "information, including a formula, pattern,

compilation, program, device, method, technique, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  The three part statutory test for the definition of a trade secret therefore requires that the information: (1) be of the kind included in the nonexhaustive list contained in the statute; (2) be "of independent economic value"; and (3) "was the subject of reasonable efforts to maintain its secrecy".  Elm City Cheese Co., Inc., v. Federico, 251 Conn. 59, 78 (1999).

An alleged trade secret is not deprived of trade secret status simply because it is comprised of materials that are "common [and] commercially available."  Elm City Cheese Co., Inc., v. Federico, 251 Conn. 59, 74.  Rather, a "plaintiff's ability to combine these elements into a successful process, like the creation of a recipe from common cooking ingredients is a trade secret entitled to protection."  Elm City Cheese Co., Inc., v. Federico, 251 Conn. 59, 75.  Finally, and more importantly for purposes of this motion, whether a particular piece of information is a "trade secret," is a question of fact. See Elm City Cheese Co., Inc., v. Federico, 251 Conn. 59, 68 (1999).

Having examined the affidavits, deposition testimony and

other evidence submitted, the court concludes that there are
questions of fact regarding each of the three prongs of the
statutory definition of a trade secret.  More specifically, with
regard to the first prong of the definition, namely, whether the
information is of the type provided for in the statute, Brown
stated at his deposition that he provided the following
information to Pop Warner: (1) "descriptions . . . with regard to
the concept of how the program worked"; (2) "plans for the use of
the program"; (3) "the program itself"; (4) "all facets of the
application . . . and how it was used"; (5) "how the program was
organized"; (6) "the way the information was stored and used";
and (7) "the concept [for how the program] worked".

    Although Brown apparently did not provide Pop Warner with
the so-called source code[1] for the program, his deposition
indicates that he provided the "program itself" to Pop Warner, as
well as an explanation or the "concept" of how the program
worked.  The term "program" is explicitly provided for in the
statutory definition of a trade secret, <u>see</u> Conn. Gen. Stat. §
35-51 (d), and thus there is question of fact as to whether the
information revealed to Pop Warner is one of the types expressly

---

[1]"A computer responds to electrical charges, the presence or absence of
which is represented by strings of 1's and 0's. Strictly speaking, 'object
code' consists of those 1's and 0's. . . . While some people can read and
program in object code, it would be inconvenient, inefficient and, for most
people, probably impossible to do so. [Therefore, computer] languages have
been written to facilitate program writing and reading. A program in such a
computer language--BASIC, C, and Java are examples--is said to be written in
'source code.'" <u>Universal City Studios, Inc., v. Corley</u>, 273 F.3d 429, 439
(2d Cir. 2001) (citations omitted).

provided for in the statute.  <u>See</u> <u>ISC-Bunker Ramo Corp. v.</u>
<u>Altech, Inc.</u>, 765 F. Supp. 1310, 1322 (N.D. Ill. 1990) (software
falls "squarely within statutory definition" of trade secret
because it is a program).  Additionally, the testimony presents a
question of fact regarding whether Brown's descriptions of how
the software took the information entered by the user, converted,
stored and organized that information is a "formula, . . .
method, technique, [or] process".  Put simply, there is at least
a question of fact as to whether Brown provided Pop Warner with
the metaphorical "recipe" for how the software combined the
various elements into a marketable product.  <u>See</u> <u>Elm City Cheese</u>
<u>Co., Inc., v. Federico</u>, 251 Conn. 59, 75 ("plaintiff's ability to
combine [various] elements into a successful process, like the
creation of a recipe from common cooking ingredients is a trade
secret entitled to protection").

Likewise, with regard to the second prong of the statutory
definition of a trade secret, namely, whether the information has
independent economic value, the materials submitted indicate that
there is a question of fact as to this element.  Specifically,
the affidavits submitted by Dreamcatcher indicate that both Pop
Warner and Dreamcatcher thought that the program filled an
existing need in the marketplace.  Similarly, Brown's affidavit
indicates that the Pop Warner considered the program sufficiently
worthwhile and valuable to schedule a meeting to discuss the use
of the program and that Pop Warner subsequently undertook efforts

to aid in the marketing and sale of Dreamcatcher's software.

Finally, the submitted materials also indicate that there are material questions of fact regarding whether Dreamcatcher took reasonable steps to ensure the confidentiality of the information. Specifically, Dreamcatcher's affidavit indicates that it negotiated an extensive confidentiality agreement with Pop Warner before the meeting of February 8, 2000. Consequently, the court concludes that there are questions of material fact as to each of the three prongs of the statutory definition of a trade secret.

Relying essentially on the district court opinion in LinkCo, Inc. v. Fujitsu, Ltd., 230 F. Supp. 2d 492 (S.D.N.Y. 2002), Pop Warner nevertheless contends that summary judgment is warranted in this case. More specifically, Pop Warner contends that LinkCo stands for the proposition that "courts recognizing trade secret protection for software do so when the contested subject matter can be described with some degree of specificity."[2] The court rejects Pop Warner's reliance on LinkCo. First, contrary to Pop Warner's assertion, nothing in the LinkCo opinion stands for the requirement that trade secrets relating to software must be identified with specificity to survive summary judgment.

Second, LinkCo is distinguishable. In LinkCo, following a

---

[2]Pop Warner cites additional cases in support of this proposition, none of those cases, however, can reasonably be construed to support the proposition the defendant asserts.

11

trial on the merits, the defendant moved for a judgment as a matter of law contending that the plaintiff had failed to prove that it possessed a viable trade secret requiring protection under New York trade secret law.  Similar to the instant case, the plaintiff in LinkCo had created a software program. According to the plaintiff, the trade secret was the "architecture" of the software, which the plaintiff likened to the architecture of a building.  The court in LinkCo concluded that, "while [the plaintiffs analogy to a building's architecture] helps to explain how [the plaintiff's] combination of elements may be novel, it also demonstrates how the architecture will be easily ascertainable by the public once the product is marketed. Similar to the architecture of a building, once the combination of [the plaintiff's] elements is seen by the public, the system's architecture will become obvious and easily duplicated."  LinkCo, Inc. v. Fujitsu, Ltd., 230 F. Supp. 2d 492, 500.  Consequently, "because the software architecture cannot remain secret once it is marketed, it cannot rise to the level of a trade secret, as a matter of law." LinkCo, Inc. v. Fujitsu, Ltd., 230 F. Supp. 2d 492, 500.

In the instant case, Dreamcatcher contends that the secrets it revealed had to do with the internal processes of the program. Unlike the secret at issue in LinkCo, the internal processes of the software are not readily identifiable, nor obvious and easily duplicated.  Accordingly, Pop Warner's reliance on LinkCo is

misplaced.  The court therefore concludes that there are
questions of material fact regarding whether Dreamcatcher
revealed trade secrets to Pop Warner.  Pop Warner's motion for
summary judgment in regard to the CUTSA cause of action is
therefore DENIED.

2.   Breach of the Confidentiality Agreement

Pop Warner also contends that summary judgment should be
granted with regard to the breach of the confidentiality
agreement cause of action because Dreamcatcher never revealed any
proprietary or confidential information to Pop Warner.
Therefore, Pop Warner argues that it could have never revealed
such information in breach of the agreement.  The court rejects
this argument.

The confidentiality agreement defines the protected
information as including the  "structure, sequence, design of
software, any and all records, prototypes, data, [and] processes
. . . ."  As with the CUTSA cause of action, the court concludes
that there is a question of fact as to whether information of
this type was revealed to Pop Warner.  Therefore, Pop Warner's
motion for summary judgment with regard to the breach of the
confidentiality agreement is DENIED.

2.   Lanham Act Cause of Action

Pop Warner next contends that summary judgment should be
granted in relation to the Lanham Act cause of action for two
reasons.  First, Pop Warner contends that a Lanham Act cause of

action may only be brought against someone in the business of selling "goods and services."  Thus, because Pop Warner was not "engaged in the marketing and promoting of competing products," Dreamcatcher's claim must fail.  Second, assuming _arguendo_ that a Lanham Act action could be maintained against Pop Warner, because "there is no evidence of false and disparaging statements, [Dreamcatcher's Lanham Act action] must fail."  The court addresses these arguments separately.

A.   Requirement That Pop Warner be a "Product Seller"

Pop Warner first contends that, "despite the apparent breadth of § 43a [of the Lanham Act], it is clearly directed only against false misrepresentations in connection with a defendant's sale of goods or services."  Thus, because Pop Warner is a not-for-profit organization and "does not sell or profit from computer software," Dreamcatcher's claim must fail.

Dreamcatcher responds by stating that there is no such seller requirement in the statute.  Furthermore, according to Dreamcatcher, even if there was such a requirement the evidence submitted indicates that "[n]ot only did [Pop Warner] intend to sell the software to its constituents . . . , but, more importantly, it saw the software as a way to drive people to its web site and thereby attract more revenue for itself from web site advertisers."

Section 43a of the Lanham Act, as codified at 15 U.S.C. § 1125(a)(1), provides that:

14

Any person who, on or in connection with any goods or
services, or any container for goods, uses in commerce any
word, term, name, symbol, or device, or any combination
thereof, or any false designation of origin, false or
misleading description of fact, or false or misleading
representation of fact, which--
(A) is likely to cause confusion, or to cause mistake, or to
deceive as to the affiliation, connection, or association of
such person with another person, or as to the origin,
sponsorship, or approval of his or her goods, services, or
commercial activities by another person, or
(B) in commercial advertising or promotion, misrepresents the
nature, characteristics, qualities, or geographic origin of
his or her or another person's goods, services, or commercial
activities,
shall be liable in a civil action by any person who believes
that he or she is or is likely to be damaged by such act.

The clear text of the statute indicates that 15 U.S.C.
1125(a)(1) applies to "any person." Thus, the fact that a
specific defendant is a not-for-profit organization does not
protect it from liability under the plain language of the
statute. Nevertheless, a party seeking relief under section 43
generally must demonstrate that they are in competition with the
defendant. See Havana Club Holding v. Galleon, 203 F.3d 116, 130
(2d. Cir. 2000) ("[a]lthough a section 43 plaintiff need not be a
direct competitor, it is apparent that, at a minimum, standing to
bring a section 43 claim requires the potential for a commercial
or competitive injury"). Consequently, the relevant question is
not whether the defendant is a so-called product seller, but
rather, whether the defendant is in competition with the
plaintiff.

Having reviewed the submissions of the parties, the court

concludes that there is a question of fact as to whether Pop
Warner was in competition with Dreamcatcher.  More specifically,
in its brief submitted in support of its motion for summary
judgment, Pop Warner admits that "[i]t has developed an internet
'web-based' software application which it makes available to
participating league administrator at a nominal cost, to help
recoup development costs."  Additionally, Dreamcatcher has
submitted the deposition testimony of Butler, wherein he states
that in the spring of 1999 Pop Warner had entered an agreement
with a second party for the creation of a Pop Warner website.  As
part of the proposed website, members and participants of Pop
Warner would have access to administrative software.  This
evidence creates a question of fact regarding whether Pop Warner
was in competition with Dreamcatcher in the development and
marketing of an administrative software program.

     B.    Evidence of False and Disparaging Remarks

     Pop Warner further contends that the Lanham Act cause of
action must fail because "there is no evidence of false and
disparaging statements."  Specifically, Pop Warner contends that
the statements Dreamcatcher relies on for its product
disparagement claim are true and therefore they cannot serve as a
basis for product disparagement cause of action.

     "The Lanham Act . . . prohibits only *false or misleading*
descriptions or *false or misleading* representations of fact made

16

about one's own or another's goods or services." <u>Groden v.
Random House, Inc.</u>, 61 F.3d 1045, 1052 (2d Cir. 1995) (emphasis
added).

Having reviewed the material submitted, the court concludes
that there is a question of fact regarding whether the statements
made by Pop Warner were false.  For example, Dreamcatcher alleges
that Pop Warner stated to prospective Dreamcatcher customers that
Dreamcatcher's software could not be used in conjunction with the
internet.  Pop Warner does not deny that these statements were
made but contends that they were true.  Brown's affidavit,
however, states that he informed Pop Warner that Dreamcatcher's
software was designed to be "integrated with the web."
Construing this evidence in the light most favorable to
Dreamcatcher, knowledge that the program could be "integrated
with the web" certainly undermines Pop Warner's claim that its
assertion was true.  The court therefore concludes that there are
questions of fact regarding the truth of the various statements
made by Pop Warner.  Accordingly, Pop Warner's motion for summary
judgment with regard to the Lanham Act claim is DENIED.

3.    <u>Product Disparagement</u>

Pop Warner also contends that summary judgment should be
granted with regard to Dreamcatcher's common law product
disparagement cause of action.  Similar to its Lanham Act
argument, Pop Warner contends that summary judgment should be
granted because the alleged false and disparaging comments are,

17

in fact, true.  Having previously concluded that there is a question of fact regarding whether the alleged statements are false, Pop Warner's motion for summary judgment with regard to the common law product disparagement cause of action is DENIED.

4.   Tortious Interference with Business Expectancy

Pop Warner next contends that summary judgment should be granted with regard to Dreamcatcher's tortious interference with business expectancy cause of action.  Specifically, Pop Warner contends that Dreamcatcher failed to plead and "fails to identify the existence of a contracted sale that was rescinded based on the defendant's conduct."

Dreamcatcher responds that the existence of a contract is not a necessary element to a claim for tortious interference with business expectancy.  Additionally, Dreamcatcher contends that they have "pleaded the business relationships and expectancies with which [Pop Warner] tortiously interfered . . . [and have] presented evidence of these expectancies."

"It is well established that the elements of a claim for tortious interference with business expectancies are: (1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." High-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 27 (2000).  Thus, "it is not essential . . . [to a cause of action

18

for tortious interference with a business expectancy] that . . . the tort . . . [result] in a breach of contract to the detriment of the plaintiff." Goldman v. Feinberg, 130 Conn. 671, 674 (1944).

Nevertheless, "a plaintiff may [not] recover for an interference with a mere possibility of his making a profit. On the contrary, wherever such a cause of action as this is recognized, it is held that the tort is not complete unless there has been actual damage suffered." Goldman v. Feinberg, 130 Conn. 671, 675 (1944). In other words, "it is essential to a cause of action for unlawful interference with business that it appear that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." Goldman v. Feinberg, 130 Conn. 671, 675 (1944). Consequently, although the existence of a contract is not a required element for liability for tortious interference, the plaintiff nevertheless must prove that "there was a reasonable probability that the plaintiff would have made a profit." Selby v. Pelletier, 1 Conn. App. 320, 324 (Conn. App. 1996).

Applying these principles, Pop Warner's motion for summary judgment is granted. In its complaint, Dreamcatcher alleges that Pop Warner interfered with prospective sales to customers from whom Dreamcatcher had oral commitments, and, as a result of this interference, the customers failed to buy its product.

19

Dreamcatcher, however, has failed to proffer the requisite "specific facts" in support of these allegations. See Fed. R. Civ. P. 56(e). More specifically, aside from broad conclusory allegations that Dreamcatcher had "potential customers," Dreamcatcher has proffered no specific evidence of any expectancies or oral commitments from the alleged potential customers. Therefore, Dreamcatcher has failed to meet its burden with regard to the first element of a tortious interference claim, namely, that there was a business relationship between the plaintiff and another party.

Additionally, assuming arguendo, that there was some business relationship between Dreamcatcher and another party, Dreamcatcher has failed to proffer any evidence that Pop Warner's alleged interference thwarted that relationship. In other words, there is no evidence to support the claim that there was a reasonable probability that Dreamcatcher would have made a profit absent Pop Warner's interference. Accordingly, Pop Warner's motion for summary judgment with regard to the cause of action for tortious interference with business expectancy is GRANTED.[3]

5.    CUTPA

Pop Warner next contends that summary judgment should be

------

[3]Pop Warner also contends that summary judgment of the tortious interference claim is warranted because Dreamcatcher has failed to prove "some improper motive or improper means" on the part of Dreamcatcher. Because the court concludes that summary judgment is appropriate on other grounds, the court does not address this issue.

granted with regard to Dreamcatcher's CUTPA cause of action. Because Pop Warner's memorandum of law conflates its CUTPA and tortious interference arguments into a single section, its argument with regard to the CUTPA claim is less than clear. Indeed, Pop Warner's arguments appear wholly directed at the tortious interference cause of action.

The only relevant CUTPA case law cited by Pop Warner, is the Connecticut Appellate Court's opinion in <u>Downes-Patterson Corp. v. First National Supremarkets, Inc.</u>, 64 Conn. App. 417 (2001). That case, however, is inapposite to the instant matter. In <u>Downes-Patterson</u>, the plaintiffs contended that the defendants' failure to act was a violation of CUTPA. The appellate court concluded that there could be no CUTPA violation because the defendant had no affirmative duty to act. <u>Downes-Patterson Corp. v. First National Supremarkets, Inc.</u>, 64 Conn. App. 417, 427-28 (2001). Thus, <u>Downes-Patterson</u> turns on the proposition that the defendants' unfair trade practice was its alleged failure to act. In the instant case Dreamcatcher does not allege that Pop Warner failed to act. Rather, Dreamcatcher alleges that Pop Warner did indeed act, and that such acts were injurious to Dreamcatcher. Pop Warner's reliance on <u>Downes-Patterson</u> is therefore misplaced. Accordingly, Pop Warner's motion for summary judgment with regard to the CUTPA cause of action is DENIED.

6.    <u>Breach of Software License</u>

Pop Warner finally contends that summary judgment should be

granted with regard to the cause of action for breach of the software license. Specifically, Pop Warner contends that there is no question of fact that it "decompiled, reverse engineered, disassembled, modified, or otherwise put Dreamcatcher software to improper use" in violation of the software license.

Dreamcatcher responds by stating that although "Brown cannot testify that there was any decompiling, reverse engineering or other similar conduct," "Dreamcatcher's proof concerning this fact . . . comes from other sources, and it is just as necessarily circumstantial."

Dreamcatcher's software license claim is essentially a contract claim. In order to succeed under a contract claim, the plaintiff must prove that the contract was in fact breached. See, e.g., Bouchard v. Sundberg, 80 Conn. App. 180, 189 (2003). The contract at issue, namely the software license, provides in relevant part that: "The End-User may NOT sublicense, assign, or distribute copies of the software to others. . . . The End-User may NOT decompile, reverse engineer, disassemble, or otherwise reduce the software to human readable form. THE END-USER MAY NOT MODIFY, ADAPT, TRANSLATE, RENT, LEASE, LOAN, RESELL FOR PROFIT, OR NOT FOR PROFIT, DISTRIBUTE, OR OTHERWISE ASSIGN OR TRANSFER THE SOFTWARE OR CREATE DERIVATIVE WORKS BASED UPON THE SOFTWARE OR ANY PART THEROF . . . ." (Emphasis in original).

Dreamcatcher contends that Pop Warner breached the license by decompiling, reverse engineering or disassembling the program

22

in order to use Dreamcatcher's program in the creation of its own program. In support of the allegation that Pop Warner reverse engineered its software, Dreamcatcher points to essentially two pieces of evidence: (1) Pop Warner announced the creation of a web site that would perform similar functions to that of Dreamcatcher's software after it had reviewed Dreamcatcher's program; and (2) Pop Warner failed to introduce that web site after the instant lawsuit was filed. Thus, Dreamcatcher relies on the inference that Pop Warner's choice to not release the program is indicative of the fact that it reverse engineered Dreamcatcher's program.

Although this court must draw all inferences in favor of the plaintiff's claim, those inferences must be reasonable. Cf. World Trade Center Properties, L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 166 (2d Cir. 2003) ("[w]hen ruling on motion for summary judgment, a court is required . . . to draw all reasonable inferences in [favor of non-movant]") (emphasis added). Based on the limited evidence submitted, it is simply unreasonable to conclude that Pop Warner's failure to introduce a web based program similar to the plaintiff's therefore indicates that Pop Warner decompiled Dreamcatcher's program. At best, the speculative evidence rises to the level of mere suspicion, which, of course, is insufficient to defeat summary judgment. Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("[c]onclusory

allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact"). Consequently, Pop Warner's motion for summary judgement with regard to the Dreamcatcher's cause of action for breach of the software license is GRANTED.[4]

## CONCLUSION

Based on the foregoing, the defendant's motion for summary judgment is GRANTED in part and DENIED in part.

It is so ordered this _____ day of January, 2004 at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge

---

[4]Pop Warner also contends that summary judgment of the software license cause of action is warranted because: (1) the software license applied only to end users, Pop Warner was not an end user, and therefore "the software license was not applicable" to Pop Warner; and (2) the software license cause of action is preempted by the Federal Copyright Act. As the court has concluded that summary judgment should be granted because there is no question of material fact with regard to the question of breach, the court does not reach these issues.

Pop Warner has also moved for summary judgment, with regard to all of the counts, on the ground that the plaintiff failed to comply with Local Rule 56 (a)3. Although the plaintiff's initial filing did not technically comply with Local Rule 56, following an order to show cause, the plaintiff corrected its non-conforming filing in a timely manner. Consequently, the court denies the defendant's request that summary judgment be granted because the plaintiff failed to comply with Local Rule 56.

24